UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MARSHA SCOTT,<br><br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 2:22-CV-386 JD |

**OPINION AND ORDER**

Plaintiff Marsha Scott appeals the denial of her claim for Disability Insurance Benefits. The Administrative Law Judge ("ALJ") had denied her claim after determining she was not disabled. As explained below, although substantial evidence supports the ALJ's finding about Ms. Scott's residual functional capacity, no such evidence is present regarding the number of jobs existing in the national economy that Ms. Scott can perform. The ALJ's failure to develop the record in this regard requires a reversal and remand of the Agency's decision.

**A. Relevant Medical Evidence and ALJ's Finding**

Ms. Scott's relevant medical history began in December 2017, when her left tibia was fractured in a car accident. (R. at 38.) Ms. Scott claimed her disability onset date as December 23, 2017. Ms. Scott was employed as a waitress in 2019 and worked some period in 2018 but there appears to be no dispute that she ceased working in 2020.

The ALJ concluded that the effects of the tibia fracture constitute a severe impairment under the Regulations (20 C.F.R. 404.1520(c)) because it imposes more than a minimal limitation on Ms. Scott's physical ability to engage in basic work activities. (*Id.* at 13.) As

relevant to her appeal, the ALJ also found that Ms. Scott suffered from affective/anxiety disorder, which she found as non-severe impairments. The ALJ based her decision on the fact that there was no evidence that these conditions limited Ms. Scott's ability to work.

Next, the ALJ found that Ms. Scott doesn't have an impairment, or combination of impairments, that meets or equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Even so, the ALJ determined that Ms. Scott's residual functional capacity ("RFC") is limited to performing sedentary work[1] with occasional balancing, stooping, crouching, and climbing ramps and stairs, although she can never kneel, crawl, climb ladders, ropes or scaffolds. She can tolerate occasional exposure to extreme cold and slippery surfaces. In adopting the RFC, the ALJ included no psychological limitations. Although such a limitation was provided in one of the hypotheticals posed to a vocational expert, without a finding of an actual psychological impairment, the ALJ excluded this limitation from the final RFC finding. (R. at 21.) Given Ms. Scott's RFC, the ALJ concluded that she could no longer work as a waitress, a job she held for years before filing for disability insurance benefits.

As a final step, in considering whether Ms. Scott is disabled, the ALJ determined that, although she can no longer work as a waitress, there are other jobs in significant numbers in the national economy that she can perform. As relevant here, in response to the ALJ's hypothetical, the Vocational Expert ("VE")[2] testified that Ms. Scott could work as a lens inserter,[3] a board

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567

[2] At the hearing before the ALJ, Ms. Scott's counsel stipulated to the VE's qualifications as an expert. (R. at 56.)

[3] According to the Dictionary of Occupational Titles, a lens inserter "[f]its lenses into plastic sunglass frames and places frames on conveyor belt that passes under heat lamps which soften frames preparatory to setting of lenses." https://perma.cc/8426-2C7R (last visited January 24, 2024).

2

assembler,[4] or an address clerk[5] of which 15,000, 50,500, and 7,900 positions exist, respectively, in the national economy. (R. at 57–58.) The ALJ asked whether the VE's testimony was consistent with the DOT to which the VE responded "I believe that it is, Your Honor." (R. at 58.) After posing additional hypotheticals, the VE allowed Ms. Scott's attorney to question the VE. Her attorney started by asking the VE about the source of the identified jobs:

> Q. Yes, Judge, briefly. Thank you. Mr. Norman [VE], before I add to the hypotheticals, in terms of the various jobs you identified, what are the source [sic] of the job numbers you identified?
>
> A. Yeah, they come—start out with information from the Bureau of Labor Statistics, and what I do is after a DOT is identified, I look at the OES code that that comes under, and the number of jobs under that OES code, and then go through a process of elimination, where some jobs are no longer in the economy, but yet they're still in the DOT. And once those are eliminated and go through that process of elimination, I come up with an educated estimate as to what's remaining.
>
> Q. Okay. So you walked me through the methodology you used as well. Thank you. . . .

(R. at 60–61.)

In her ruling, the ALJ accepted the VE's opinion about the jobs that Ms. Scott could perform and that those jobs existed in significant numbers in the national economy. (R. at 20–21.) The ALJ thus determined that Ms. Scott was not disabled for purposes of her application for

---

[4] A board assembler "[i]nspects printed circuit board (PCB) assemblies for defects, such as missing or damaged components, loose connections, or defective solder: Examines PCB's under magnification lamp and compares boards to sample board to detect defects. Labels defects requiring extensive repairs, such as missing or misaligned parts, damaged components, and loose connections, and routes boards to repairer. Performs minor repairs, such as cleaning boards with freon to remove solder flux; trimming long leads, using wire cutter; removing excess solder from solder points (connections), using suction bulb or solder wick and soldering iron; or resoldering connections on PCB's where solder is insufficient. Maintains record of defects and repairs to indicate recurring production problems. May reposition and solder misaligned components. May measure clearances between board and connectors, using gauges." https://perma.cc/48ZZ-XN9F (last visited January 24, 2024).

[5] An address clerk "[a]ddresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail." https://perma.cc/D7FD-6W9H (last visited January 24, 2024).

disability insurance benefits. *See* 20 C.F.R. § 404.1520 ("If you can make an adjustment to other work, we will find you not disabled. If you cannot, we will find you disabled.").

**B.  Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has a duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.

2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C.     Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity,

which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D.     Discussion**

On appeal, Ms. Scott makes two arguments. First, she claims that the ALJ failed to consider the cumulative effect of all her severe impairments in fashioning the RFC. In particular she argues that, in addition to the lasting effects of a left tibia fracture, she suffers from a non-displaced fracture of the L2 disc, broad-based disc bulge at L5-S1, and lower back pain with right-sided sciatica. She submits that she has very limited tolerance for standing, walking, lifting, and carrying and requires a cane for walking which requires a sit/stand limitation in her RFC. She also claims that she's suffering a severe mental impairment caused by anxiety and depression related to her car accident that worsened her focus, concentration, energy level, and motivation. According to Ms. Scott, these limitations should have also been included in her RFC.

Second, Ms. Scott maintains that no substantial evidence supports the ALJ's conclusion that there are jobs in significant numbers in the national economy that she can perform. Ms. Scott submits that the VE's reliance on the Dictionary of Occupational Titles ("DOT") demonstrates

flawed methodology, which the ALJ incorporated into her findings. According to Ms. Scott, there is no evidence that the jobs proffered by the VE exist in significant numbers, or that they are the kind of jobs that she can perform. Ms. Scott argues that the ALJ failed in her duty to elicit the source of the VE's job numbers as well as the methodology he used so as to determine whether the methodology was reliable.

Ms. Scott's first argument is unavailing as it lacks any support in the record or case law. However, her second argument has merit requiring a remand for additional consideration concerning the jobs in the national economy that Ms. Scott can perform.

**(a)** *Ms. Scott's RFC*

Ms. Scott argues in a conclusory fashion that the ALJ should have recognized that she uses a cane and can work only with a sit/stand option. For example, she states that she requires a cane for walking when her pain worsens (Pl.'s Opening Br. at 4), but ignores the ALJ's finding that the record does not document—at any point—a medical need for a cane (R. at 17). Yet "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9b. Ms. Scott has not provided any such documentation. Instead, she is merely asking the Court to substitute her opinion for the ALJ's.

Similarly, Ms. Scott insists upon a sit/stand option for working but does not explain how such a requirement is supported by the record. In fact, there is considerable evidence that her fractured tibia healed without complications, providing a substantial basis for only a sedentary

7

limitation. Even though Ms. Scott had a number of medical appointments for years, clinician notes do not evidence acute painful distress. Instead, it appears that her tibia healed without complication. For example, in February 2018, Ms. Scott was seen for a sore throat and cough and her treating clinician noted unremarkable musculoskeletal findings. (Exh. 2F at 31 *et seq*.) Ms. Scott did not see a doctor again until December 2018, and her visit notes indicate that she had followed a conservative, over-the-counter pain control regimen. (*Id*. at 27 *et seq*.) She saw a doctor in May 2020 for a swollen ankle but the visit notes reflect conservative treatment for pain and that she had mild ankle edema (swelling). (*Id*. at 20.)

As the ALJ points out in her decision, despite these unremarkable medical evaluations, Ms. Scott stated to the agency consultative examiner in March 2020 that she had severe standing and walking limitations as well as lifting limitations of more than 15 pounds of weight. Contrasting these claims were the examiner's observations that she was alert and oriented and in no acute apparent distress. (Exh. 1F at 3.) She was able to get on and off the examining table with some difficulty but was not using a cane. Her muscle strength was normal and rated five out of five. Also, the very next day, Ms. Scott saw her primary care clinician where she was seeking a letter for her plastic surgeon that she was free from illness at that time. During this visit, she denied any musculoskeletal issues in sharp contrast with her claims the day before. (Exh. 2F at 17.)

Ms. Scott does not contradict these facts nor the fact that for the rest of 2020, while being seen by her nurse practitioner and reporting intermittent myalgia-like complaints, she never reported being in painful distress. Moreover, her clinicians placed no limitations on her and did not prescribe any pain management regimen. Ms. Scott also does not challenge the ALJ discounting, for lack of longitudinal record, her complaints at a psychological consultative

examination that it took her a year after the car accident to learn how to walk again and that she had shattered her knee which required five surgeries to repair. Instead, she simply restates these allegations in her brief without any reference for support in the record.

Ms. Scott also faults the ALJ for finding her mental impairments to be non-severe and for failing to include any social limitations in her RFC finding. In doing so, Ms. Scott ignores the substantial evidence the ALJ relied on before concluding that she "was not persuaded that the claimant was limited in any area secondary to psychological issues" (Tr. at 14.) Among the evidence the ALJ cited was the state-agency psychological consultants' opinions that she had no limitations in social functioning and that her mental impairments were non-severe. (Tr. at 14, 71, and 83.) In fact, the ALJ dedicated an entire page (single-spaced) to evaluating the medical evidence for the alleged psychological limitations, contrasting Ms. Scott's subjective claims with the actual evidence in the record. Ms. Scott does not claim that the ALJ misconstrued the record or ignored an entire line of evidence that is contrary to her finding and does not otherwise explain the purported error. The ALJ did not have to accept Ms. Scott's subjective complaints. "Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007).

Finally, Ms. Scott asserts that the ALJ committed reversible error in not mentioning that she had a closed fracture at one level of her lumbar vertebra and a partially bulging disk stemming from a December 2017 car accident. She claims that this diagnosis shows that she was more limited than the ALJ's RFC finding for a restrictive range of sedentary work, but she cites no evidence to support her claim. The record repeatedly shows that Ms. Scott was diagnosed with a fracture at one level of her lumbar spine "with routine healing." (Tr. at 319–30.) There is

no indication that Ms. Scott was treated for this past injury or for the bulging disc beyond December 2017, the relevant period at issue, and these conditions are consistently listed as simply part of her past medical history. (Tr. at 293, 302, 321, 325–26, 514, 518, 530, 541, and 547.) Moreover, Ms. Scott did not mention these injuries as grounds for her alleged disability. (Tr. 173, 178, 279, 477.)

      Finally, Ms. Scott suggests in passing that the ALJ should have discussed and imposed a sit/stand option and social limitations in her RFC finding because some of her hypotheticals to the VE included these limitations. Her suggestion has no basis in law and it ignores the reality that, when posing various hypotheticals to the VE, the ALJ may not yet know what a claimant's RFC is. Hypotheticals are just that—hypotheticals. *See Gribben v. Kijakazi*, No. 21-1987, 2022 WL 59404, at *2 (7th Cir. Jan. 6, 2022) ("True, Gribben asserted that she needed to nap daily for at least an hour. But the ALJ did not find that Gribben faced this daily restriction—and her medical records and daily activities did not require the ALJ to find that she needed daily, hourlong naps. Thus, the vocational expert's statement (that a person of Gribben's background who required a daily rest hour could not work) was not relevant to whether Gribben was disabled.") (citation omitted); *Megan E. v. Saul*, No. 1:19-CV-3230, 2020 WL 5204088, at *4 (S.D. Ind. Sept. 1, 2020) ("[Claimant] does not present any applicable authority for the proposition that an ALJ is obligated to discuss the VE's response to a hypothetical question that does not match the ALJ's ultimate RFC finding. The VE's opinion concerning the availability of qualifying work is conditional, so long as the individual has the limitations described. Because the ALJ did not find that [claimant] was limited to occasional use of her left hand, the VE's opinion that such an individual could not work is not applicable to [claimant's] case. The ALJ had no duty to discuss the inapplicable testimony of the VE."). In addition, the ALJ's removal of

a more restrictive limitation than the limitations ultimately assigned to the claimant does not by itself invalidate the VE's opinion. *See Jolene C. v. Saul*, No. 20 CV 50219, 2021 WL 2156426, at *6 (N.D. Ill. May 27, 2021) ("Moreover, the Seventh Circuit has stated that, when an ALJ omits from the RFC a limitation that was presented in a hypothetical to the VE, there is no error if the hypothetical posed a more restrictive limitation than what was supported by the record.") (citing *Vang v. Saul*, 805 F. App'x 398, 402 (7th Cir. 2020)).

As noted already, in evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez*, 336 F.3d at 539. The ALJ evaluated both the evidence favoring Ms. Scott and the evidence favoring the claim's rejection, and it cannot be said that her ultimate decision regarding Ms. Scott's impairments is not based on substantial evidence. "The claimant bears the burden of producing medical evidence that supports her claims of disability," *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008), which Ms. Scott has failed to meet. Accordingly, the Court affirms the ALJ's RFC finding.

**(b)** *Vocational Expert's Testimony*

At step five of the determination of disability, an ALJ routinely relies on an opinion from the VE, as did the ALJ in Ms. Scott's case, to determine whether there are jobs in significant numbers in the national economy that a claimant can perform. The ALJ found that such jobs exist, but Ms. Scott argues that no substantial evidence supports the ALJ's conclusion.

"The expert's jobs estimate is critical to this appeal. If a claimant cannot perform his previous work, the Social Security Administration bears the burden of showing that a significant

number of other jobs are available to the claimant." *Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

> As applied to an expert's estimate of available jobs in the national economy, "the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." [*Chavez v. Berryhill*], 895 F.3d 962, 968 (7th Cir. 2018). This does not mean that the VE's opinion must satisfy the standard for admission of expert testimony under Rule 702 of the Federal Rules of Evidence, which does not apply in disability proceedings. *Id*. As we explained in *Chavez*, a precise count is not necessary: "A VE's estimate will be just that—an estimate." *Id*. Still, the method used to estimate job numbers "must be supported with evidence sufficient to provide some modicum of confidence in its reliability." *Id*. at 969. And where, as here, the claimant challenges the job-number estimate, the ALJ "must require the VE to offer a reasoned and principled explanation" of the method he used to produce it. *Id*. at 970. And the explanation must be sufficient to instill some confidence that the estimate was not "conjured out of whole cloth."

*Brace*, 970 F.3d at 821–22.

Ms. Scott argues that there's no substantial evidence supporting the ALJ's conclusion that there are other jobs in significant numbers in the national economy that Ms. Scott can do as testified by the VE. She asserts that the ALJ didn't hold the VE to account for the reliability of his job number estimates and did not make him explain his methodology.

The Commissioner's response to Ms. Scott's argument is cursory, without any citations to authority, and does not address the cases upon which Ms. Scott is relying. The Commissioner merely quotes the VE's short response to Ms. Scott's counsel's question about the source of the jobs numbers, restates what the VE said, and concludes—without analyzing the testimony—that Ms. Scott's argument fails. (DE 15 at 12–13.)

Having reviewed the VE's testimony, the Court finds that his estimates are not the product of a discernable and reliable method. Here, again, is his answer to counsel's question as to the source of his job numbers:

> A. Yeah, they come—start out with information from the Bureau of Labor Statistics, and what I do is after a DOT is identified, I look at the OES code that

that comes under, and the number of jobs under that OES code, and then go through a process of elimination, where some jobs are no longer in the economy, but yet they're still in the DOT. And once those are eliminated and go through that process of elimination, I come up with an educated estimate as to what's remaining.

(R. 60.)

The VE's testimony suffers from the same shortcomings as in *Brace*, where the Court of Appeals remanded the case for further consideration. In *Brace*, the Seventh Circuit considered the VE's testimony that an estimated total of 140,000 jobs existed for a callout operator, semiconductor bonder, registration clerk, and a counter clerk which he considered claimant as able to perform. When asked by claimant's attorney to explain his methodology,

> The expert answered that no study (and no software available to him) lists the number of jobs associated with any job category in the database, including the categories that he assigned to Brace. Instead, he linked the job categories from the Dictionary of Occupational Titles to a database called the Occupational Employment Statistics[6]:
>
>> We're looking at the total number of DOT titles . . . that are in that OES category, and then based upon an understanding of how those jobs are performed, how they exist, there's a weighting that [is] done to those categories and from that we get an estimate of the amount of jobs in the specific categories.

*Brace*, 970 F.3d at 820–21.

The claimant's lawyer then asked the VE to explain his methodology for this "weighting" process to which the VE responded with more ambiguity:

> Well, it's—it's that combination of, one, you are looking at the number of titles that are in that category[,] and then based upon the—my information that I have as far as how the frequency of those jobs are performed, then we do an allocation based upon weighting or re-weighting those allocations to get the estimates of the numbers. So you look at that particular job title and how it is weighted to the total number of jobs that [are] in that OES category to make an estimate. And all these are estimates because . . . there is no specific calculation.

---

[6] The database of Occupational Employment Statistics appears to be the same database that the VE considered in Ms. Scott's case. (*See* R. at 60–61 (the VE testifying that he looks "at OES code").)

13

*Id.* at 821.

> The Court of Appeals found "[t]his answer entirely unilluminating." *Id*. at 822.
>
> Testimony that incants unelaborated words and phrases such as "weighting" and "allocation" and "my information that I have" cannot possibly satisfy the substantial-evidence standard. What allocations? How is the weighting and re-weighting performed? According to what criteria? And what is the unidentified "information" in the expert's possession?
>
> . . .
>
> The VE's jargon about his weighting methodology was neither cogent nor thorough—indeed, it was unintelligible. And he never claimed that his method for estimating job numbers is a well-accepted one, much less explained why that is so.

*Id.* The court said that this parlance "strikes us as the agency taking a 'trust me' approach rather than—as required by the statute and regulations—carrying its burden to demonstrate that significant employment exists in the national economy for a person with this claimant's restrictions." *Id*. at 823.

So it is here. When Ms. Scott's attorney asked the VE to explain the source of the job numbers he identified, the VE provided no cogent explanation. Instead, his answer was as generic and "unilluminating" as the VE's answer in *Brace*. Although the ALJ made sure that the VE's resume was on file (R. at 55–56; 271) and stated in her decision that the VE "based his testimony of his professional experience" (R. at 21), the hearing transcript does not show that she elicited how his qualifications and experience actually support his jobs opinions; nor did she ask him to explain how his experience informs his methodology, so as to provide some insight what his "educated estimate" consisted of. *See Hohman*, 72 F.4th 248, 254 ("We explained that a VE's experience and qualifications alone cannot establish substantial evidence when he does not explain how that experience informs his methodology."). Without even basic answers to these questions, the Court

cannot say that the VE's methodology is reliable, that is, "based on 'well-accepted' sources" or that its steps were "'cogently and thoroughly' explained." *Id*. at 253. In its response brief, the Commissioner does not discuss *Hohman* or *Brace* and provides no authority for why the VE's methodology is sufficient or well-accepted.[7] *Cf. Brace*, 970 F.3d at 822 ("The Supreme Court's recent decision in *Biestek* explained that a vocational expert's job-number testimony will survive review under the substantial-evidence standard as long as it rests on a well-accepted methodology and the expert describes the methodology 'cogently and thoroughly.'" (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1155, (2019)).) In other words, the VE's explanation is not "sufficient to instill some confidence that the estimate was not 'conjured out of whole cloth.'" *Brace*, 970 F.3d at 822.

The Commissioner suggests that, if Ms. Scott's attorney was not satisfied with the VE's answers, he could have further questioned him, and by failing to do so he may have waived the issue. Yet the Commissioner provides no authority for his argument which ignores the Seventh Circuit's admonition that "when a claimant challenges a vocational expert's job-number estimates, the ALJ has a duty to spend time inquiring into the expert's methodology." *Ruenger v. Kijakazi*, 23 F.4th 760, 764 (7th Cir. 2022). Worse yet, the Commissioner's argument effectively and impermissibly shifts the burden at step five to Ms. Scott. *See Chavez*, 895 F.3d at 970 ("By accepting the VE's estimates at step five because they were 'not contradicted,' the ALJ effectively and impermissibly shifted

---

[7] By failing to develop his argument, the Commissioner has waived it. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal citation omitted).

the burden to Chavez."). It is not Ms. Scott's burden to establish that other jobs exist in significant numbers in the national economy that she may perform.

The VE need not provide exact calculations to establish the modicum of confidence, *Hohman*, 72 F.4th at 254, but a VE should "provide[] a reasoned explanation based on hands-on experience working in the field, market surveys, or conversations with employers, [that] can establish sufficient confidence in his job-number estimates even though the claimant may not be able to exactly duplicate them." *Id.* (citing *Chavez*, 895 F.3d at 968 (recognizing that the "agency's regulations do not mandate a precise count of job numbers")). Because no substantial evidence supports the ALJ's determination that Ms. Scott can perform jobs existing in significant numbers in the national economy, the Court will remand this case for further consideration. *See Brace*, 970 F.3d at 823 ("As in *Chavez*, 'it may be that the evidentiary gap [can be] filled through expanded testimony from the VE about his estimates or through some other showing that there are a significant number of jobs in the economy' available to Brace given his limitations.") (quoting *Chavez*, 895 F.3d at 970)).

### C. Conclusion

The Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: February 8, 2024

                                                  /s/ JON E. DEGUILIO  
                                                  Judge  
                                                  United States District Court